G1L9DIAS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          11 CR 1032 (PAE)

5   VLADAMIR DIAZ,

6              Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           January 21, 2016
9                                          2:05 p.m.

10

    Before:
11
                    HON. PAUL A. ENGELMAYER
12
                                           District Judge
13

14                       APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    JESSICA ORTIZ
17       Assistant United States Attorney

18  ANDREW PATEL
         Attorney for Defendant
19

20  ALSO PRESENT:

21  MERCEDES AVALOS
    DAVID MINTZ
22  Spanish Interpreters

23

24

25

G1L9DIAS

1                  (In open court; case called)

2                  MS. ORTIZ:  Good afternoon, your Honor.  Jessica Ortiz

3       for the government.

4                  THE COURT:  Good afternoon, Ms. Ortiz.

5                  MR. PATEL:  Good afternoon, your Honor.  Andrew Patel

6       for Mr. Diaz.

7                  THE COURT:  Very well.  Good afternoon to you,

8       Mr. Patel.  Good afternoon to you, Mr. Diaz.

9                  THE DEFENDANT:  Good afternoon.

10                 THE COURT:  I'll note for the record that Mr. Diaz is

11      assisted today by a court certified Spanish speaking

12      interpreter.  Thank you.

13                 THE INTERPRETER:  You're welcome.

14                 THE COURT:  We're here today to impose sentence in the

15      case of the United States v. Vladamir Diaz.

16                 On November 3, 2014, Mr. Diaz pled guilty to three

17      counts in the indictment, Count Two charging a conspiracy to

18      commit racketeering, Count Seven charging commission of a

19      murder in aid of racketeering relating to David Avilla Gomez,

20      and Count 36 charging use of a firearm during and in relation

21      to the same murder in aid of racketeering.

22                 In preparation for today's proceeding, I've reviewed

23      the plea agreement and the transcript of the plea proceedings.

24      I've also reviewed the presentence report which is dated

25      February 27, 2015, including the recommendation and addendum to

G1L9DIAS

1    that report.

2              I've also received and reviewed the following

3    additional submissions:  The defendant's sentencing submission

4    dated December 23, 2015, the government's sentencing submission

5    in the form of a 5K letter dated January 14, 2016, and most

6    recently a letter from Mr. Patel dated January 19, 2016 which

7    attaches a letter from Mr. Diaz.

8              Have the parties received each of those submissions?

9              MS. ORTIZ:  Yes, your Honor.

10             MR. PATEL:  Yes.

11             THE COURT:  And have any other submissions been made

12   in connection with this sentencing?

13             MR. PATEL:  No, your Honor.

14             MS. ORTIZ:  No, your Honor.

15             THE COURT:  All right.  Mr. Patel, have you read the

16   presentence report?

17             MR. PATEL:  Yes.

18             THE COURT:  Have you discussed it with your client?

19             MR. PATEL:  Yes.

20             THE COURT:  Mr. Diaz, has it been translated to your

21   client or has he read it in English?

22             MR. PATEL:  I believe we did it in English, your

23   Honor.  My client's English is excellent albeit in court, we've

24   previously discussed this and he --

25             THE COURT:  I'll inquire of him.

G1L9DIAS

1        Mr. Diaz, have you read the presentence report?

2        THE DEFENDANT:  I don't know what the presentence

3   report is.

4        The PSR.  Yes.

5        THE COURT:  The record will reflect that prior to the

6   defendant affirmatively answering that question Mr. Patel

7   refreshed his memory by putting the PSR in front of him.

8        Mr. Patel, could you move the microphone closer to

9   your client.

10        MR. PATEL:  I'm sorry, your Honor.

11        THE COURT:  Mr. Diaz, have you had the opportunity to

12   go over with Mr. Patel any errors in the report or anything

13   else that should be taken up with the court?

14        THE DEFENDANT:  No, sir.

15        THE COURT:  I'm asking if you have had the chance to

16   speak with your lawyer about the report so that he can raise

17   anything that -- with me that needs to be taken up based on the

18   report.  Have you had a chance to talk to Mr. Patel about the

19   report?

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  Ms. Ortiz, have you reviewed the

22   presentence report?

23        MS. ORTIZ:  Yes, your Honor.

24        THE COURT:  Focusing for the moment just on factual

25   accuracy.  Are there any objections to the report regarding its

G1L9DIAS

1    factual accuracy?

2              MS. ORTIZ:  None from the government, your Honor.

3              MR. PATEL:  Your Honor, there is one -- it's not

4    that -- one amendment, I guess that's the best word, to the

5    report.  And it's actually on the second page where it says

6    release status.

7              THE COURT:  Right.

8              MR. PATEL:  It says arrested and detained since

9    April 23, 2014.  That is the date that my client was brought to

10   federal custody.

11             THE COURT:  Right.

12             MR. PATEL:  He was actually arrested in New Jersey on

13   January 5 of -- on a case that was dismissed less than two

14   weeks later and was detained pending transfer here.  So he's

15   actually been in custody, I would ask the court --

16             THE COURT:  In other words, you're saying that from

17   about two weeks after the January 5, 2014 arrest the only basis

18   for his detention were the federal charges?

19             MR. PATEL:  I don't know if he would have been

20   detained on the New Jersey case at all.  I would ask that the

21   date be January 5, 2014, your Honor.  Certainly the case was

22   dismissed -- the New Jersey case, it's in the presentence

23   report, I believe it was dismissed on January -- yes, your

24   Honor -- it's on page 25, paragraph 149 -- the New Jersey case

25   was dismissed on January 13, 2014.

G1L9DIAS

1          THE COURT:  So by any measure you're saying that he

2     deserves credit for the time he has been in custody since at

3     least January 13, 2014.  And you are -- you would argue that he

4     deserves eight days more credit than that.  I don't know that

5     I'm going to be able to resolve that point.  But in any event

6     you want page two to be resolved to suggest -- to state that he

7     was arrested on January 5 because it's accurate.

8          MR. PATEL:  That's correct, your Honor.

9          THE COURT:  Ms. Ortiz, do you have any views about

10    this?

11         MS. ORTIZ:  No, your Honor.  I think it's fine to

12    indicate that he's been detained at least since January 13,

13    2014.  Because that was when the New Jersey case was dismissed.

14    And Mr. Patel is correct that he was held in New Jersey pending

15    transfer here, so he was arrested on the warrant at that time.

16         THE COURT:  Look, what I'll do is I will direct that

17    page two be amended so that the date instead of being April 23,

18    2014 is January 5, 2014.  There's a separate question about

19    whether or not he gets credit for those eight days.  Ordinarily

20    that's something that's worked out by the Bureau of Prisons,

21    although when I can confidently reach a conclusion on it I'm

22    always happy to include that in the PSR because it helps assure

23    fairness and clarifying things.  The issue here is it's not --

24    I don't know that I can put myself in the shoes of the

25    New Jersey authorities and know whether or not he would have

G1L9DIAS

1    been detained but -- you know, solely on the New Jersey charges

2    during that eight-day period.

3              Mr. Patel, we're getting ahead of ourselves, and I was

4    going to ask about those dates.  Is there anything you want

5    said in the judgment about when the commencement of calculation

6    of his federal sentence ought to be?  I don't know that I can

7    get you past January 13.

8              MR. PATEL:  I will take every day I can get, your

9    Honor.  If you can give me January 13, that would be great.  If

10   you can give me January 5 --

11             THE COURT:  Look, I can say the defendant's time in

12   federal custody is to be measured beginning no later than

13   January 13.  I think maybe that's the language I'll use which

14   gives you the opportunity, should it be worth your while, to

15   litigate on his behalf as to the eight days before it.

16             MR. PATEL:  The BOP ultimately makes those

17   determinations but I appreciate that.  Certainly much better

18   for Mr. Diaz than April.

19             THE COURT:  So, one moment.

20             (Pause)

21             I'm going to read aloud a sentence that I would

22   propose to add to the judgment.  You tell me if this is

23   accurate.

24             The defendant's time served on the instant federal

25   charges should be treated as having commenced no later than

G1L9DIAS

1    January 13, 2014, the day when the state charges on which he

2    was then being held were dismissed.

3                MR. PATEL:  Thank you.

4                THE COURT:  It's an accurate statement, right?

5                MR. PATEL:  It is.  Absolutely.

6                THE COURT:  And I take it, it doesn't preclude you

7    from arguing about the prior eight days but it doesn't put me

8    in the uncomfortable position of making a finding that I'm

9    unsure of.

10               MR. PATEL:  Understood.  Thank you.

11               THE COURT:  So I'll revise paragraph two of the -- or

12   page two of the PSR to change the date to January 5 and I will

13   include in the J&C a sentence along the lines of the one I've

14   just read aloud.

15               Any other objections from the defense to the factual

16   recitations in the PSR?

17               MR. PATEL:  No.

18               THE COURT:  Then the presentence report will be made a

19   part of the record in this matter.  It will be placed under

20   seal.  In the event an appeal is taken, counsel on appeal may

21   have access to the sealed report without further application to

22   this court.

23               Ordinarily at this point I ask if there's any reason

24   why the parties' sentencing submissions should not be publicly

25   filed.  I can answer that question.  The answer is yes.  So you

G1L9DIAS

1    don't have to publicly file those.

2              Next issue is the sentencing guidelines.

3              The court is no longer required to follow the

4    sentencing guidelines, of course, but I am required to consider

5    the applicable guidelines in imposing sentence.  To do so it's

6    necessary that the court accurately calculate the guideline

7    sentencing range.

8              In this case because there was a cooperation agreement

9    the parties did not stipulate to the application predeparture

10   of the sentencing guidelines to Mr. Diaz's case.  Nevertheless,

11   it appears to me that the parties agree now that the

12   defendant's offense level is 40, his criminal history category

13   is I, which, but for the mandatory minimum sentence of life

14   imprisonment on Count Seven, would yield a guideline range of

15   between 292 and 365 months imprisonment predeparture.

16             Do the parties agree with those calculations?

17             MS. ORTIZ:  Yes, your Honor.

18             MR. PATEL:  Yes, your Honor.

19             THE COURT:  Then obviously the government's motion

20   under Section 5K is going to make this somewhat academic but,

21   for the record, based on the parties' present agreement, the

22   absence of objection, and my independent evaluation of how the

23   guidelines apply, I accept the guideline calculation in the

24   presentence report along the lines I've just described.

25             The next subject I need to cover is departures which

G1L9DIAS

1     is to say within the guidelines framework.  Ms. Ortiz, is the

2     government moving, as it has indicated it was going to do, for

3     a downward departure?

4           MS. ORTIZ:  Yes, your Honor.

5           THE COURT:  That motion is granted.  I certainly agree

6     that a significant downward departure is merited here.

7           Does the government wish to be heard with respect to

8     sentencing?

9           MS. ORTIZ:  Certainly, your Honor.

10          Mr. Diaz, as indicated by the PSR and in the

11    government's letter, was arrested in 2014, well after many of

12    his coconspirators were arrested, indeed some -- at least a

13    year later, in some instances two years later.  And so

14    Mr. Diaz's very quick decision to cooperate put him in a

15    difficult position because much of the information that he was

16    in a position to provide was confirmatory of what the other

17    cooperators had told the government.

18          He was involved not significantly with the

19    Trinitarios.  The court is well aware of both his testimony and

20    his involvement.  But the government ultimately decided to sign

21    him up because knowing then that Mr. Lopez Cabrera had stated

22    his intent to go to trial, from the government's perspective

23    there was a question about the murder in Yonkers.  And it was

24    through Mr. Diaz's recitation of his time spent with

25    Lopez Cabrera about the drug dealing that Mr. Lopez Cabrera

G1L9DIAS

1  engaged in, the fact that Mr. Lopez Cabrera did, in fact, have

2  a drug debt that was outstanding and had been unable to pay

3  that drug debt, that he undertook the series of robberies and

4  ultimately the attempted robbery that led to the death of David

5  Avilla Gomez in which the defendant participated and Mr. Diaz

6  participated in along with them.  That murder is, of course --

7  it's a felony murder.  He's subject to life in jail.

8          Looking at the other defendants, the court will recall

9  Miguel Strong, who did not cooperate, was the driver in that

10 murder.  And the court sentenced him to 192 months.  And in

11 some ways Mr. Strong and Mr. Diaz were similarly situated in

12 their other criminal conduct as well.  A lot of it had been

13 minor, not much in the way of other attacks or attempted

14 murders in which the court has seen from other cooperators or

15 other defendants.

16          THE COURT:  You would say Mr. Strong is the closest

17 comparator pre-downward departure?

18          MS. ORTIZ:  Pre-downward departure, yes.

19          THE COURT:  Okay.

20          MS. ORTIZ:  I think that there are differences.

21 Mr. Strong was the driver.  He stayed in the car.  Mr. Diaz

22 exited the car with Jose Marmelejos intending to go and rob the

23 victim.  However, Mr. Diaz didn't have the gun.  Mr. Marmelejos

24 had the gun.  And Mr. Marmelejos ultimately was the defendant

25 who shot and killed David Avilla Gomez.

G1L9DIAS

| | |
|---|---|
| 1 | THE COURT:  Is there any meaningful difference between |
| 2 | getting out of the car and not?  All four of the people who |
| 3 | weren't the shooters basically were facilitating the same |
| 4 | murder and knew that it was a live risk that it could |
| 5 | transpire.  But did the people who got out of the car |
| 6 | materially advance it more than the people who were in the car? |
| 7 | MS. ORTIZ:  Well, I think that Mr. Diaz advanced it in |
| 8 | that he was -- Mr. Diaz got out of the car -- "volunteered" was |
| 9 | his testimony at the trial, volunteered to get out of the car |
| 10 | when Lopez Cabrera said who is going to go do this. |
| 11 | And while he didn't go out there, I think, he -- he |
| 12 | intended to rob the victim.  He intended to engage in a |
| 13 | physical act restraining -- whether it be restraining the |
| 14 | victim, putting his hands on the victim, chasing the victim. |
| 15 | Whereas, I think Miguel Strong, the court will remember, the |
| 16 | government in Miguel Strong's plea agreement agreed to a |
| 17 | three-level downward departure because we never had evidence |
| 18 | that he was intending to participate in the actual robbery |
| 19 | rather than just be a driver. |
| 20 | THE COURT:  So in that respect this defendant is to a |
| 21 | degree more culpable in that incident than Miguel Strong. |
| 22 | MS. ORTIZ:  Correct, your Honor. |
| 23 | THE COURT:  How did the other acts of violence |
| 24 | compare?  There's a lot of robberies, home invasions, if you |
| 25 | will, that Mr. Diaz has.  How does that compare with the other |

G1L9DIAS

1   non-Avilla Gomez criminality with Mr. Strong?

2           MS. ORTIZ:  Your Honor, Mr. Strong was involved in

3   some narcotics trafficking, was not involved in -- had been

4   involved in some other robberies with Felix Lopez Cabrera and

5   some of the other members of the Trinitarios.

6           Mr. Diaz I think was involved in, in terms of number,

7   far more than we -- than we know about.  So on a pure

8   quantitative level Mr. Diaz was involved in more of those

9   crimes.

10          So, I'm happy to answer any other questions that the

11  court has.

12          Mr. Diaz has admitted his wrongdoing, understands what

13  he did wrong, and I think for him it was a matter of

14  unfortunate and difficult decisions that sort of took a turn

15  for the worst.  He was on a bad path, but took a turn for the

16  worst when he engaged himself with Lopez Cabrera and began

17  living with him.

18          As I mentioned in the government's 5K letter, once

19  people got arrested, once he ultimately disconnected himself

20  from Lopez Cabrera because of the falling out that they had, he

21  seemed to set himself on a better path and was headed there, I

22  think it's indicated in his letter and the government doesn't

23  have anything to dispute, that really in the time before he was

24  arrested when he was living in New Jersey and working and

25  living with his family, he was living a law-abiding life.  And

G1L9DIAS

1    it's my belief from speaking to Mr. Diaz and spending hours

2    with him that that's his intent and that's really his desire.

3              THE COURT:  I was thinking coming in that the

4    analogue's predeparture, in terms of relative severity,

5    somewhere in the Miguel Strong/Hargelis Vargas range; in other

6    words, Strong is 192, Vargas is in the low 200s; that that

7    sounded like -- you know, something in the 20-year range or

8    slightly short of it would have been, but for the 5K, fairly

9    consistent with the pattern of sentences I have imposed

10   relative to the conduct of the Trinitarios.  Do you agree with

11   that?

12             MS. ORTIZ:  Yes, your Honor.

13             THE COURT:  Now then help situate me as to

14   cooperation.  I think I understand what you're saying, which is

15   his -- he did not ultimately alert the government to any

16   proveable criminality?  You knew about the Avilla Gomez murder.

17   And you knew about his role in it.  But his testimony

18   significantly assisted the government's ability to prove it up,

19   including the in-aid-of-racketeering component of it because

20   the motive for the murder was not as surely a

21   Trinitarios-furthering motive until Mr. Diaz explained the

22   backstory.

23             MS. ORTIZ:  That's correct, your Honor.

24             THE COURT:  I think I'm reading also as well from your

25   letter, and in comparison with the tone and level of detail of

G1L9DIAS

1   some of the others, that while you have no bone to pick with

2   his cooperation, he did what he could under the circumstances,

3   his cooperation was not nearly as game-changing as that of a

4   number of people I have recently sentenced.

5            MS. ORTIZ:  No, your Honor.  It was not.  And I -- in

6   being completely candid, and I've had these conversations with

7   Mr. Diaz and Mr. Patel, the way this case -- the progression of

8   this case was that cooperators -- even some who came in late,

9   gave us new crimes.  Mr. Diaz did not.

10           THE COURT:  Right.

11           MS. ORTIZ:  And so there weren't --

12           THE COURT:  He did what he could with what he had.

13           MS. ORTIZ:  He did what he could, and he gave us

14   information that we attempted to follow up on, particularly on

15   some of the crimes that had happened in Haverstraw and really

16   identifying some of the incidents, particularly home invasions,

17   that took place up there which had not been part of the

18   government's investigation.  Ultimately it was sort of all

19   conduct that came in at the trial before your Honor of Felix

20   Lopez Cabrera.  So there was some evidentiary value to his

21   cooperation in terms of getting new evidence, but I don't think

22   it resulted in, again, anyone new being charged, new crimes

23   being uncovered or solved for that matter.

24           THE COURT:  Any analogues in terms of the value of

25   cooperation that you want to offer?  If you're uncomfortable

G1L9DIAS

1    doing that, I understand.  Each of these cases presents its own

2    unique problem because of the apples and oranges facts of

3    different criminality, different ability to give cooperation as

4    of the time apprehended.  I've had people who have committed

5    far worse crimes and yet were way more generative in terms of

6    cooperation in terms of unlocking full murders and clusters of

7    people, as you well know.  I'm looking for any guidance you can

8    give me.

9            MS. ORTIZ:  I think, you know -- he is not -- he was

10   not -- I would not put him in a category -- he is really in a

11   category of his own.  I would not put him in a category with,

12   for instance, Mr. Ballenilla who gave what I would call

13   game-changing or, to use your term, game-changing information.

14   However, I wouldn't put him -- I think at the other end of the

15   spectrum is a defendant such as Anderson Abreu.  I would not

16   put him in that category.

17           THE COURT:  Right.  Because this defendant helped

18   prove up culpability in a particular murder in a particular

19   trial.

20           MS. ORTIZ:  I think that, I think the timing of his

21   cooperation.

22           THE COURT:  Right.

23           MS. ORTIZ:  Anderson Abreu pled guilty and then

24   entered into a cooperation agreement later on.  Mr. Diaz was

25   sort of on the cooperation while -- the minute he walked in the

G1L9DIAS

 1    door.

 2                THE COURT:  In other words, the issue is, I guess,

 3    less when they pled, because that's largely controlled by the

 4    office and you don't want somebody to plead until you are

 5    certain you've got the full universe of their culpability,

 6    meaning a number of very important cooperators pled very late

 7    but you were able to certify to me that they were in the

 8    process of cooperating long before.

 9                MS. ORTIZ:  Sure.

10                THE COURT:  That describes Mr. Diaz.  It doesn't

11    describe Mr. Abreu.

12                MS. ORTIZ:  Correct.  I guess the timing at which

13    their cooperation began or happened.

14                THE COURT:  Let me ask you this.

15                You know what I've done with Mr. Abreu, and for the

16    record and for the defense, he got an eleven-year sentence, a

17    defendant who played a role in a -- was it two murders?  I

18    guess he played a secondary role -- a support role in two

19    murders, testified at a Fatico hearing and was available before

20    that but was never the direct commissioner of the murder and

21    his -- is that right?

22                He hit with a hammer, I suppose, with Salgado and he

23    played also a support role in the Richard --

24                MS. ORTIZ:  Canela murder.

25                THE COURT:  -- Canela murder.  In my judgment there

G1L9DIAS

was, in large part because the cooperation had been on the late
side, that the discount from what I otherwise would have given,
which would have been around the 300-month mark, I wound up
putting him at about 132.  Eleven years.

          I take it that what you're saying is that Mr. Diaz
both starts at a somewhat lower point and gets a little more
credit.

          MS. ORTIZ:  Yes.  I think their criminal conduct is
different.

          THE COURT:  Right.  But Mr. Diaz's other criminal
conduct is substantially more serious than Mr. Abreu's in
that --

          MS. ORTIZ:  I think in terms of numbers Mr. Diaz was
involved in more.  But I think if you're looking at the two
homicides that Mr. Abreu was at, I don't -- it was only two,
but two murders versus intending to rob somebody and being
involved in that robbery which then turns into a felony murder
and a large number, not to understate it, a large number of
other robberies and home invasions.  I don't know when you're
comparing those apples and oranges which is worse.

          THE COURT:  It's at least three dimensional here in
terms of the different vectors and I really want to make sure
that the sentences here bear a rational relationship and it
becomes hard to keep all the variables straight, which is why I
engage in these colloquies.

G1L9DIAS

1        Anything further you want to add in terms of

2   comparators either in terms of conduct, cooperation, anything?

3        This has been very helpful.

4        MS. ORTIZ:  No, your Honor.  I think, again, I'll

5   reiterate that Mr. Diaz came in and he was prepared to

6   cooperate.  I think there was -- there was some -- we got off

7   to a bumpy start because I think there was -- Mr. Diaz, as I

8   came to find out, was a very smart man and didn't necessarily

9   understand the legal reasons why he was responsible for the

10  crimes that he committed.

11       THE COURT:  He had the same problems first year law

12  students do with felony murder.

13       MS. ORTIZ:  Yes.  Exactly.

14       But once we got over criminal law, then he really was

15  a good cooperator and was -- provided us with good details and

16  I think that was culminated by his testimony at the trial.

17       THE COURT:  I take it the government's not pursuing

18  forfeiture.

19       MS. ORTIZ:  No, your Honor.

20       THE COURT:  I need to ask, even though I can see what

21  the answer is, I take it there are no relatives of Avilla Gomez

22  who wanted to communicate with the court in connection with

23  this sentencing.

24       MS. ORTIZ:  No, your Honor.

25       THE COURT:  Thank you.

G1L9DIAS

1          Very helpful, as always.  Thank you, Ms. Ortiz.

2          Mr. Patel.

3          MR. PATEL:  Your Honor, it's sort of recovering from

4     an out-of-body experience when a Senior Assistant United States

5     Attorney uses the line "only two murders."  This is a strange

6     case.  Given the oddness of it -- Mr. Diaz brings his own

7     unusual character to it, albeit in a positive sense.  As your

8     Honor knows from the letter that was submitted to you, a rather

9     unusual letter from Mr. Diaz's biological mother, he had a

10    rough start.  He made some major bad decisions as a young man,

11    participated in activities related to the Trinitarios that

12    bring him here today.

13          There comes a point, whenever there's a 5K letter, of

14    when did the light bulb go off?  Often the light bulb goes off

15    when someone is in handcuffs or in the MCC and their attorney

16    explains their options to them.  Mr. Diaz left the Trinitarios

17    long before law enforcement showed up.

18          THE COURT:  Long before law enforcement showed up to

19    arrest him or long before December 2011 when law enforcement

20    showed up and arrested 50 Trinitarios?

21          MR. PATEL:  Arrested him.  He was living in New Jersey

22    with Ms. Rodriguez, sitting here today, leading a life that he

23    wanted to lead.  He was working.  It wasn't the greatest jobs

24    in the world.  He was supporting a family.  As soon as he came

25    into -- here, I wasn't even sure that this would be an option.

G1L9DIAS

1        Thank you.

2        I spoke with -- there was a large prosecution here.  I

3   actually spoke with Ms. Heller who assured me that cooperation

4   was an option and it was one he immediately accepted.

5        I think part of the reason that he had less to

6   offer -- that's a bad term.  You know, when you're trying

7   quantify these things, he did whatever he could do.  But there

8   was just a limited period of time when he was involved with

9   this.  But he told the government as accurately as he possibly

10  could everything he did.

11       He did that fully aware of the problems that he could

12  have with immigration down the road.  Fully aware of the

13  problems that he could have with the Bureau of Prisons.

14  Basically said -- he continued that trajectory he already put

15  himself on of being a law-abiding citizen.

16       That's not something I see all the time.  Usually

17  people have to be extracted from the criminal lifestyle.  It's

18  rare that you see someone who voluntarily takes up essentially

19  manual labor, stocking shelves, minimum wage job, and is happy

20  to do it.  And when he would lose one minimum wage job, not

21  because he did a bad job but because his employer didn't want

22  him to have benefits, he went and got another one.  And he just

23  kept working and doing what he had to do to support his

24  girlfriend and her three children; not his children, her

25  children, who they consider him to be the father.  I've met

G1L9DIAS

1    with them.  That's how they talk about him.

2            There's a -- this is a huge probation report.  But

3    there's a line in it that really jumped out at me.  I

4    highlighted it, your Honor.  Let me just see if I can quickly

5    find it.

6            Perhaps it jumped out at your Honor.

7            My client attempted to join the United States Navy.

8    Service to a country that he has not ever formally been made a

9    citizen of.  I think that effort, the fact that someone would

10    want to join the Navy also speaks to who he is as a person.

11    That is, again, an effort that very few people who stand in

12    this courtroom have made.  He wasn't accepted because he didn't

13    have a GED.  I wish he had been accepted.  I don't want to get

14    on my lobbying horse.  I'm a -- I have a great deal of respect

15    for the United States military, specifically the Navy with whom

16    I've done a great deal of work, and there are extraordinary

17    reasons why that is a universal experience.

18            THE COURT:  Talk into the microphone.

19            MR. PATEL:  Why that as a universal experience has a

20    lot to say for it.  But getting -- the fact that Mr. Diaz

21    attempted to join the Navy, the fact that he left this gang on

22    his own, the fact that he took menial jobs and supported a

23    family, the fact that he almost instantaneously agreed to

24    cooperate, cooperated to the absolute best of his ability, puts

25    him on a trajectory that I think your Honor has every reason to

G1L9DIAS

1    believe he will continue.  And so I would ask your Honor --

2    your Honor has done a lot of these sentencings in this case.

3    This is a big indictment.

4                    THE COURT:  This is?

5                    MR. PATEL:  A big indictment.  I don't know how many

6    defense attorneys have talked about their clients leaving

7    voluntarily, attempting to join the Navy, and getting

8    legitimate work and supporting a family.  I would venture not

9    many because it's a speech I've rarely given.

10                   So I think in terms of a departure, variance, for what

11   is an appropriate sentence for this young man, I would ask your

12   Honor to be as lenient with him as you can to encourage others

13   who have made mistakes but then turned their lives around on

14   their own, that that is an experience and a viewpoint and

15   respect for law that the court will encourage.  I thank you.  I

16   have nothing else to add unless you have some questions.

17                   THE COURT:  No.  I have a question for Ms. Ortiz just

18   prompted by what you have said.

19                   Ms. Ortiz, I understand that the defendant started to

20   cooperate virtually immediately.  Do you have any evidence as

21   to the circumstances under which he ceased to be involved with

22   the gang?  Did it postdate the takedown of the gang in

23   December 2011?  Did it predate it?

24                   MS. ORTIZ:  Your Honor, it predated the takedown of

25   the gang because, if I'm recalling correctly from his testimony

G1L9DIAS

1    at trial, he actually -- Lopez Cabrera asked him to leave or he

2    left Lopez Cabrera's house because there was a falling out over

3    whether or not Mr. Diaz had stolen some items.

4              THE COURT:  Right.

5              MS. ORTIZ:  So really as a result of that Mr. Diaz --

6    all the evidence, the government's evidence suggested that

7    after that Mr. Diaz went on his way back to Haverstraw and sort

8    of did his own thing, occasionally saw Lopez Cabrera in

9    Haverstraw but really had walked away from the gang.

10             One other point that I want to be sure to make in

11   light of Mr. Patel's comments and the court's inquiries about

12   whether Mr. Diaz's cooperation was game-changing.  This isn't a

13   matter of Mr. Diaz being arrested two years later or coming in

14   to cooperate later.  I think the fact of the matter is, and the

15   way this case unfolded is, the government learned about David

16   Avilla Gomez in early 2012 after Mr. Marmelejos was arrested.

17   Mr. Marmelejos began cooperating, admitted to the government

18   that he had been involved in that murder and that he was the

19   shooter.  At that time, Mr. Diaz was not part of the

20   government's investigation.  So there was really no point in

21   time when Mr. Diaz could have put himself in a position to

22   be -- you know, to provide game-changing cooperation.

23             THE COURT:  Right.

24             Was he charged in 2012?

25             MS. ORTIZ:  He was charged in 2012.

G1L9DIAS

1            THE COURT:  So, he's charged -- but you have no

2    evidence that he knew that he had been charged?

3            MS. ORTIZ:  No.

4            And credibly Mr. Diaz says I didn't know that I was

5    charged.  I had heard other people had gotten arrested but I

6    sort of didn't know that -- there was an arrest warrant or

7    anything for me.  And I've always credited his statements about

8    that.

9            So, we didn't know about David Avilla Gomez

10   pre-December 2011.  Mr. Marmelejos gets arrested, comes in and

11   cooperates and says I committed this murder with four other

12   people.  At that point the government first learns of Mr. Diaz

13   and attempts to identify him and then charges him in December

14   of 2012.

15           So, even if he had been arrested in 2012 and decided

16   to cooperate January 1 of 2013, his cooperation would have been

17   the same because --

18           THE COURT:  It would have been confirmatory.

19           MS. ORTIZ:  Exactly.

20           THE COURT:  Because by definition after Marmelejos

21   you've got enough evidence to support an indictment.

22           MS. ORTIZ:  Correct.

23           THE COURT:  As to Avilla Gomez.

24           MS. ORTIZ:  Correct.

25           THE COURT:  Okay.  Thank you.

G1L9DIAS

1          MR. PATEL:  Your Honor, of course the minute you sit

2     down you find what you're looking for.  The reference in the

3     PSR to Mr. Diaz's efforts to join the Navy are on page 29,

4     paragraph 174.

5          THE COURT:  Right.  Got it.  Thank you.

6          Mr. Diaz, do you wish to make a statement?

7          THE DEFENDANT:  Yes.

8          Should I stay sitting down?

9          THE COURT:  You should stand up.  Thank you.

10          THE DEFENDANT:  I would like to say to your Honor that

11     I feel badly for all my wrongdoings and that throughout the

12     time that I have been incarcerated I have learned many things

13     that I can utilize on the outside, things that are not bad.

14     And I want to ask all the people that I have harmed for

15     forgiveness, including my family.  That's all.

16          THE COURT:  Thank you, Mr. Diaz.  I'm going to take a

17     few moments and reflect on the sentence.

18          (Pause)

19          THE COURT:  Is there any reason why sentence should

20     not now be imposed?

21          MS. ORTIZ:  No, your Honor.

22          MR. PATEL:  No, your Honor.

23          THE COURT:  As counsel have agreed and as I have

24     stated, the guideline range that would apply to this case but

25     for cooperation is 292 to 365 months imprisonment.  Of course,

G1L9DIAS

1    within the guidelines framework there is a bona fide and an,

2    indeed, compelling basis here for a downward departure based on

3    Mr. Diaz's cooperation and I intend to depart significantly

4    today.

5              Under the Supreme Court's decision in Booker and the

6    cases that have followed it, of course, the guideline range,

7    even when one takes into account a defendant's cooperation, is

8    only one factor that a court must consider in determining the

9    just and appropriate sentence.  A court must also consider all

10   of the other factors set forth in Title 18 United States Code

11   Section 3553(a), the sentencing statute, and I have done so

12   here.

13             These factors include the nature and circumstances of

14   the offense and the history and characteristics of the

15   defendant, the need for the sentence imposed to reflect the

16   seriousness of the offense, to promote respect for the law, and

17   to provide just punishment for the offense, the need for the

18   sentence imposed to afford adequate deterrence to criminal

19   conduct, the need for the sentence imposed to protect the

20   public from further crimes of the defendant, and the need for

21   the sentence imposed to provide the defendant with needed

22   educational or vocational training, medical care, or other

23   correctional treatment in the most effective manner.  It's

24   important that the court avoid unwarranted sentence disparities

25   among defendants with similar records who have been found

G1L9DIAS

guilty of similar conduct.  In a case like this with 76

defendants with many common violent acts, with many cooperating

witnesses, it's important that the court assure that there is

an equity and fairness and rational consistency among the

various sentences imposed and I've tried my best to do that.

        The court is also required to impose a sentence

sufficient but no greater than necessary to comply with the

purposes that I've just described, and I find that the sentence

I'm about to pronounce is sufficient but not greater than

necessary to satisfy the purposes of sentencing that I've just

mentioned.

        One moment.

        (Pause)

        Mr. Diaz, I've given a lot of thought and attention to

the appropriate sentence in your case in light of those various

3553(a) factors and the appropriate purposes of sentencing as

reflected in the statute.  The following are my thoughts.

        Had you not cooperated but merely pled guilty to the

same crimes, I would have imposed a very high sentence in this

case.  I expect that the sentence I would have imposed would

have been towards the low end of the guideline range in this

case which calls for a term of between approximately 24 and

about 30 years imprisonment.  The reason for such a high

sentence is obvious.  You've participated in many acts of

violence in connection with the Trinitarios.  Most horribly you

G1L9DIAS

1   participated in the September 4, 2009 killing of David

2   Avilla Gomez which you have acknowledged was a murder in aid of

3   racketeering, in that the Trinitarios robbed and killed

4   Avilla Gomez to get his cellphone to help the gang in general,

5   and to help Felix Lopez Cabrera in particular, pay back a drug

6   debt.

7           Were it not for your cooperation a large number of the

8   3553(a) factors would demand a very high sentence, either at or

9   approaching bottom end of the guideline range.  I'm going to

10  explain briefly why that would have been.

11          So Section 3553(a) requires me to consider the

12  seriousness of the offense and the need for just punishment.

13  Here as a matter of proportionality a very long sentence would

14  ordinarily be needed.  You were part of a five-person team of

15  gang members that drove around looking for a victim to rob in

16  order to help the gang payoff a drug debt.  When the group

17  spotted David Avilla Gomez, you and two others got out of the

18  car.  One member, Jose Marmelejos, had a gun as you well knew

19  and in your presence pointed it at Avilla Gomez.  When

20  Avilla Gomez refused to turn over the cellphone, Marmelejos

21  murdered him, shooting him three times.  The group then drove

22  away.

23          I don't know how else to say this but that was a

24  thoroughly evil act by you and the others who were

25  participating.

G1L9DIAS

1          I recognize that you were not the shooter.  Had you

2     been your conduct would have been yet worse.  But you joined in

3     the mission to rob Avilla Gomez knowing that his death would be

4     one possible outcome.  And the fact that Marmelejos shot him

5     could not have come as an utter surprise to you.  You join in

6     responsibility for that murder.  Because of you and the others,

7     one innocent man lost his life and his loved ones lost him

8     forever.

9          Of course, that was only the most serious of the

10    number of acts of violence in which you engaged with the

11    Trinitarios.  In 2009 you assaulted a person with a hammer,

12    committed a home invasion, and took part in numerous robberies

13    and burglaries largely in Haverstraw, New York.  There is also

14    a limited amount of drug dealing.

15         In 2010 and 2011 you were also involved in the

16    nonfatal shooting of another person.

17         And independent of the Trinitarios you took part in

18    some 20 burglaries or home invasions and in numerous thefts

19    from cars.

20         From the point of view of the 3553(a) factor that

21    requires me to consider the need for just punishment for

22    proportionality a very long sentence would ordinarily be

23    necessary.  The fact that many of your crimes, including

24    Avilla Gomez's robbery and murder, were committed to further

25    the interest of a violent street gang, the Trinitarios,

G1L9DIAS

1    reinforces the need for a long sentence.

2            Through the course of presiding over two longs trials

3    in this case as well as numerous guilty pleas and sentences,

4    I've come to appreciate just how toxic and destructive a role

5    the Trinitarios played.  They engaged in an astonishing amount

6    of wanton brutal retaliatory violence and they sold prodigious

7    amounts of drugs.  Your actions help solidify their authority

8    and they were designed to do so, and that makes your conduct

9    worse.

10           The 3553(a) factor of general deterrence would also

11   require a very long sentence.  That factor refers to the need

12   for a sentence sufficiently long to deter other people who

13   would consider committing similar crimes, violent crimes in

14   conjunction with a gang, from doing so.  There is obviously a

15   deep need for that here.

16           Violent gang activity is regrettably an epidemic

17   problem in our city and in our country.  The Trinitarios case

18   involving some 76 defendants exemplifies it, but I'm sorry to

19   say it's only the tip of the iceberg.  There's a very

20   significant societal interest in getting the message out

21   through a pattern of substantial sentences that people who

22   commit acts of violence in conjunction with a dangerous gang

23   will receive long sentences.

24           Section 3553(a) also requires me to consider the

25   interest in what's called specific deterrence, and that refers

1    to the need for a sentence sufficient to deter the defendant in

2    front of me, here you Mr. Diaz, from committing future crimes.

3              Now, here, it is true that before 2010 you did not

4    have a criminal record.  In that respect you're unlike some

5    members of the gang who had long criminal records and yet went

6    ahead and committed crimes in conjunction with the Trinitarios.

7    For those gang members the need for specific deterrence has

8    been particularly obvious to me because their prior brushes

9    with the criminal law hadn't gotten the message across.  They

10   hadn't discouraged them from committing more crimes.

11             In your case that isn't the case.  But the sheer

12   number of criminal acts you've committed is formidable and that

13   matters.  All of those home invasions and burglaries and car

14   thefts, apart from the other acts of violence, you had to know,

15   including from the occasional arrests of your fellow

16   Trinitarios members, that you were running a real and growing

17   risk of getting arrested.  And yet you kept right on going.

18   And that says to me that there is a need for a longer sentence

19   here that would serve as a wake-up call for you and get your

20   attention so as to deter you from committing other crimes.

21             I am also to consider, under Section 3553(a), the

22   interest in public protection known as incapacitation.  Here

23   the public has an obvious interest in keeping you in prison for

24   a while.  That's particularly so given the sheer extent of

25   crimes you committed outside of the Trinitarios.  Many of your

G1L9DIAS

fellow gang members explained their criminal conduct to me as a

product of their having met and been influenced by older and

more charismatic members of this particular gang.  And that

certainly appears in part to be true of you.

But here's the thing.  You also committed a formidable

number of crimes, including burglaries and car thefts,

independent of the gang.  And so even though the gang has been

dealt a body blow by this successful prosecution, and even

though you've repudiated the gang by your actions and your

decision to cooperate, you would present a risk to the public

if you were released soon.  Given your track record, I have to

credit that you have some impulse to commit crimes that has

existed independent of the gang.  And so, unavoidably, for the

time that you are in prison you are at least incapacitated from

committing home invasions or burglaries or car thefts or

otherwise injuring the free public.

Now, to this point I've canvassed factors that point

towards a longer sentence.  But other factors, of course, most

notably your cooperation, point in the other direction and I

want to review those with you now.

To begin with, you accepted responsibility.  You did

so by pleading guilty.  That matters to me.  Had you not done

so your guideline range would have been higher and so would the

sentence I would have imposed.

Your letter to me also reflected, I thought, care and

G1L9DIAS

1    remorse.  Among other things, you wrote:  I would like you to

2    know that I take full responsibility for my actions in the

3    instant offense.  I am truly remorseful for the hurt, harm, and

4    damage that my actions have caused, all effected by my poor

5    decisions.  It's through this sense of remorse that I have

6    taken the necessary steps to show my sorrow, remorsefulness.

7           Later you write:  I have come to realize that I have

8    made many poor decisions in picking my friends and the

9    activities I involve myself in.  I now make it my daily focus

10   to make positive decisions even when the positive decision is

11   not the popular one.

12          I would note as well that it appears to me, and I

13   learned this at sentencing, that it appears that you abandoned

14   the gang before the gang was taken down, before the gang was

15   decimated by the arrests in December 2011 and that in turn is

16   an action that is consistent with acceptance of responsibility.

17          Second of all, I'm mindful that you were young in 2009

18   and 2010 when the bulk of your crimes were committed.  You were

19   ages 18 and 19.  You were certainly old enough to make mature

20   decisions but I am mindful, as well, that young men of an age

21   like that often haven't fully grown up yet.  They often make

22   impulsive stupid decisions to go along with a group, including

23   to go along with violent gang crimes.  I see that all of the

24   time in sentencings, including in this case.

25          I credit that the Vladamir Diaz who joined the other

G1L9DIAS

1   Trinitarios that fateful day in September 2009, when David

2   Avilla Gomez was killed, and who helped the Trinitarios commit

3   other crimes, is in the process of maturing and will be more

4   mature in his 30s and 40s, and 50s than he is now.  That also

5   bears on the proper sentence.

6        Third, from your counsel's very effective sentencing

7   memorandum, I see some positive sides of you and some signs of

8   maturation, including as a surrogate father to your

9   girlfriend's children.  And I learned too that you were largely

10  abandoned by your mother and had a very hard young life.  That

11  also makes it easier to see, for me to see and understand how

12  you came to be drawn into criminal activity with the gang.

13       Fourth and finally, you cooperated in this case.  You

14  rendered substantial assistance in the government's

15  investigation and prosecution.  Most significantly, you

16  testified at the trial of Felix Lopez Cabrera, Suztancia, and

17  two others.  I listened carefully to your testimony.  It came

18  across to me as credible and careful.  You provided testimony

19  and information that strengthened the government's case against

20  Lopez Cabrera.  Your testimony helped the jury understand how

21  the Avilla Gomez robbery and murder came about and occurred.

22  It particularly, to my mind, solidified, as Ms. Ortiz said, the

23  government's proof that the murder was committed in aid of

24  racketeering as opposed to for personal reasons.

25       Your testimony also valuably taught the jury about the

G1L9DIAS

1    gang's activities in Haverstraw and those in particular of

2    Lopez Cabrera, an angle, I might add, of the gang's activity.

3             THE INTERPRETER:  I'm sorry.  Excuse me.  If the

4    interpreter could ask your Honor to try to slow down a little

5    bit and also rewind the last sentence for us, if you would.

6             THE COURT:  Your testimony also taught the jury about

7    the gang's activities in Haverstraw and those in particular of

8    Lopez Cabrera.  I would add that I was largely unaware of the

9    gang's Haverstraw angle prior to hearing your detailed

10   testimony about it.

11            You testified, as well, as a knowledgeable friend who

12   had lived with Lopez Cabrera for many months about

13   Lopez Cabrera and his leadership role in the gang.  You also

14   testified about the drugs -- drug sales of the gang and the

15   gang's norms.  In my judgment your testimony, although not

16   nearly as central as that of some other cooperators, was an

17   important building block for the government's case.

18            Your cooperation had other benefits apart from that

19   trial.  As the government writes, among other things, it gave

20   the government a broader understanding of the robberies that

21   had been committed by the Trinitarios and it helped the

22   government confirm the accounts of other cooperators who had

23   come before you.

24            I also take note of the government's representation

25   that you spent numerous proffers and preparation sessions with

G1L9DIAS

the government and that you took care in those to be accurate.

Your cooperation is also laudable because it came early.  No, it did not come early in the context of the overall investigation -- if anything, by that standard it came late -- but it came early in the context of your entry into the criminal justice system.  You began to cooperate shortly after being arrested.  Because the case was well underway when you were arrested, there were limited opportunities for you to open the government's eyes to new criminal conduct.  But you cooperated fully and promptly and you deserve a significant reward for that.  It's very important that the court reward prompt cooperation, and I will do so today.

Finally, I note as to your cooperation that you undertook a very real risk in cooperating.  The Trinitarios are a violent and retaliatory gang.  There have been threats made against cooperators in this action and people believed to be cooperating.  I incorporate by reference here everything that the government wrote about that in its 5K letter, including the very recent dismaying information it related about a different cooperating witness in this case.  Your decision to cooperate exposed you and your family to risk and, as the government explains, unfortunately some risk would still exist even if you relocate voluntarily or are deported to the Dominican Republic.

In my judgment, in the end, a very significant reduction to your sentence is merited for your cooperation.

G1L9DIAS

1  Your cooperation furthermore, in addition to being valuable on

2  its own terms, gives me greater confidence, significantly

3  greater confidence that you have indeed, as your counsel

4  represents, turned a corner in your life and are more likely to

5  be law-abiding in the future.

6         That said, it is important that the court evaluate

7  each cooperator as an individual with due attention given to

8  the timing and value of your cooperation.  Your cooperation,

9  although prompt from your perspective, came later in the

10  investigation.  And, therefore, unlike others it did not, at

11  least primarily, alert the government to new crimes so much as

12  it confirmed information the government already knew and

13  fortified its ability to prove up those crimes.  And your

14  guideline range significantly is not, unlike as to some other

15  cooperators, based on conduct to which you first alerted the

16  government.  Where that is the case, there is a significant

17  reason for a yet greater downward departure because there is

18  doubt about whether the government would have known of or

19  proven up the defendant's culpability but for their own

20  confession.  In your case you already stood charged with the

21  crimes that you ultimately pled guilty to.

22         It is right that in this case the government was well

23  aware of your role in the Avilla Gomez murder in particular at

24  the time you began to proffer.  It's right that, all else being

25  equal, cooperators who both cooperate early and who break open

G1L9DIAS

1   cases get the most credit.  And it's right that defendants

2   whose guideline ranges are based on information that they

3   themselves provided merit, all else being equal, a more

4   significant reduction down from that range.

5         The sentence I'm about to impose is going to reflect a

6   very significant reduction from the bottom of the guideline

7   range.  It won't be quite as dramatic as the departures in some

8   other cases, but I think you will appreciate in a moment just

9   how significant it is and how much of a positive referendum

10   that is on your early decision to cooperate and the cooperation

11   you rendered.  The reduction that I am making for your

12   cooperation, in my judgment, is measured.  It credits you for

13   your significant cooperation, while recognizing the

14   distinctions between you and other cooperators, and keeping in

15   mind the gravity of your criminal conduct.

16         In imposing the sentence I impose here I've also spent

17   a lot of time taking into account the various other cooperators

18   I have yet sentenced.  Many factors go into such a comparison

19   involving both the timing and the nature and the utility of the

20   cooperation as well as the significance and gravity of the

21   underlying criminal conduct.  I'm confident that all things

22   considered the sentence I'm about to impose does assure a

23   logical outcome consistent with the other sentences I've

24   imposed such that, all in, there is a fairness and

25   proportionality to these sentences as a whole.

G1L9DIAS

```
 1              I'm now going to state the sentence I intend to

 2     impose.  The attorneys will have a final opportunity to make

 3     legal objections before the sentence is finally imposed.

 4              Mr. Diaz, would you please rise.

 5              After assessing the particular facts of this case and

 6     the factors under Section 3553(a), including the sentencing

 7     guidelines, it is the judgment of the court that you are to

 8     serve a sentence of 90 months imprisonment, that's

 9     seven-and-a-half years, in the custody of the Bureau of

10     Prisons, to be followed by a period of five years supervised

11     release.

12              I impose the same sentence on each count, the

13     sentences to run concurrently.

14              As to supervised release, the standard conditions of

15     supervised release shall apply.

16              In addition, you shall be subject to the following

17     mandatory conditions.

18              You shall not commit another federal, state, or local

19     crime.

20              You shall not illegally possess a controlled

21     substance.

22              You shall not possess a firearm or destructive device.

23              I'm going to suspend the mandatory drug testing

24     condition due to my imposition of a special condition requiring

25     drug treatment and testing.
```

G1L9DIAS

 1              You shall cooperate in the collection of DNA as

 2     directed by the probation officer.

 3              You must also meet the following special conditions

 4     and, for the record, I'm incorporating by reference the full

 5     text of these conditions that appears in the presentence

 6     report.  I'm just giving you a shorthand version now.

 7              You shall obey the immigration laws and comply with

 8     the directives of immigration authorities.

 9              You are to participate in a drug testing program

10     approved by the probation department.

11              You shall submit your person, residence, place of

12     business, vehicle, or other premises under your control to a

13     search on the basis that the probation officer has a reasonable

14     basis for belief that contraband or evidence of a violation of

15     the conditions of release may be found.

16              You are to provide the probation officer with access

17     to any requested financial information.

18              You are to report to the nearest probation office

19     within 72 hours of release from custody.

20              I have the legal authority to require you to pay a

21     fine.  I'm not going to do so.  I'm persuaded that you are

22     unable to pay one.

23              The government is not seeking forfeiture or

24     restitution.

25              I am required to impose and do impose the mandatory

G1L9DIAS

1      special assessment of three hundred dollars which shall be due

2      immediately.

3            Does either counsel know of any legal reason why the

4      sentence shall not be imposed as stated?

5            MS. ORTIZ:  No, your Honor.

6            MR. PATEL:  Your Honor, this is a little bit of a

7      belts and suspenders but just to make what I think is implicit

8      explicit.  I think the government does have to move pursuant to

9      Section 3553(e) in order for your Honor to be able to impose

10     this sentence.  We talked about the 5K but we didn't mention --

11           THE COURT:  Sorry.  Forgive me.  I understood -- that

12     was implicit in my question.  Ms. Ortiz, you are so moving?

13           MS. ORTIZ:  Yes, your Honor.

14           THE COURT:  Granted.  Thank you.

15           MR. PATEL:  No objection.

16           THE COURT:  Thank you.  I appreciate that.

17           Any open counts, Ms. Ortiz, that I need to dismiss?

18           MS. ORTIZ:  Yes, your Honor.

19           THE COURT:  I dismiss them.  Dismiss all open counts

20     against this defendant.

21           Mr. Diaz, to the extent you haven't given up your

22     right to appeal your conviction and your sentence as a result

23     of your guilty plea and the agreement you entered into with the

24     government, you have the right to appeal those things, your

25     conviction and your sentence.  If you are unable to pay for the

G1L9DIAS

1   costs of an appeal, you may apply for leave to appeal in forma

2   pauperis.  The notice of appeal must be filed within 14 days of

3   the judgment of conviction.

4             Is there anything further from the government?

5             MS. ORTIZ:  No, your Honor.

6             THE COURT:  Anything from the defense?

7             MR. PATEL:  No, your Honor.

8             THE COURT:  Do you want me to recommend a facility or

9   frankly will conditions of security dictate that?

10            MR. PATEL:  Your Honor, I will speak with Ms. Ortiz

11   about whether a recommendation for witness protection is

12   necessary.

13            THE COURT:  You don't need that from me.

14            MR. PATEL:  Exactly.

15            THE COURT:  But it may be that in order to be close to

16   family members he wants something said in the PSR -- in the

17   judgment.  That's all.

18            MR. PATEL:  As close to the New York metropolitan area

19   as is possible within the security concerns, your Honor.

20            THE COURT:  Do you want me to reference the security

21   concerns or simply say as possible, use the usual language

22   knowing that you and Ms. Ortiz will convey the paramount need

23   for security?

24            MR. PATEL:  Actually, your Honor, I think putting it

25   in the judgment might alert -- that is the BOP's Bible.

G1L9DIAS

1          THE COURT:  I will then say as close to the New York

2   City area as possible consistent with assuring the defendant's

3   safety.

4          MR. PATEL:  Thank you very much.

5          THE COURT:  Okay.

6          Anything further from the defense?

7          MR. PATEL:  No.  Thank you.

8          THE COURT:  Or the prosecution?

9          MS. ORTIZ:  No, your Honor.

10          THE COURT:  All right.

11          Mr. Diaz, if you'd just take a seat for a moment.

12          I just want to wish you the best.  I appreciate the

13   value you rendered to this case.  It was significant.  As you

14   can see, beginning with the guideline range, that was around

15   300 months in prison.  You wound up getting a sentence that's

16   more than a two-thirds reduction of that.  It's about

17   30 percent of the guideline range.  That's a reflection of just

18   how valuable your cooperation was.  I want to thank you and

19   commend you for that.

20          We stand adjourned.  Thank you.

21          (Adjourned)

22

23

24

25